John Randall DUMAS, d/b/a Geno's; Calvin Berry, III; Saujay Patel; Rudolf Fernandez; Dallas Motel Assoc., An Unincorporated Assoc.; FW/PBS, Inc., d/b/a Paris Adult Bookstore II; FW/PBS, Inc., d/b/a Paris Adult Video Center; FW/PBS, Inc., d/b/a Filmworld; DSB, Inc., d/b/a Denmark Bookstore; Charles E. Carlock, d/b/a Paris Adult Bookstore I; Lone Star Multi Theatres, Inc. d/b/a New Fine Arts Adult Theatre; Lone Star Multi Theatres, Inc. d/b/a La Cage; Beverly Van Dusen d/b/a Loan Star Bookstore; Beverly K. Van Dusen d/b/a Elite Bookstore; Bill Staten Jr. d/b/a Royal Land Bookstore; Bill Staten Jr. d/b/a New Venture Video; Bill Staten Jr. d/b/a Mockingbird Lane News; Bi-Ti Enterprises, Inc. d/b/a Red Letter News; Ghetti Corporation d/b/a Fantasy Land; Ghetti Corporation d/b/a Video Land Arcade; Ghetti Corporation d/b/a Video Stop; J.R.E. Enterprises d/b/a Kazbah Bookstore; Entertainment Unlimited d/b/a Eros Dallas

v.

The CITY OF DALLAS, A Texas Incorporated Municipality; A. Starke Taylor, Mayor of the City of Dallas, In His Rep. Capacity; Billy Prince, Chief of Police of the City of Dallas, In His Rep. Capacity.

No. CA 3–86–1759–R.

United States District Court, N.D. Texas, Dallas Division.

Sept. 12, 1986.

---

Ralph C. Jones, Carter, Jones, Magee, Redberg & Mays, Dallas, Tex., for Dumas.

Frank P. Hernandez, Dallas, Tex., for Berry, Patel, Fernandez and Dallas Motel Ass'n.

Malcolm Dade, Dallas, Tex., Arthur M. Schwartz, Denver, Colo., for other plaintiffs.

David Labrec, Sol Villasana, Mark O'Briant, Office of City Atty., Dallas, Tex., for defendants.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

The law of zoning allows the will of a majority, expressed through a representative body, to control the evolution of a community and shape its character.[1] The law of free speech, in contrast, prevents the majority will from suppressing minority expression that the majority finds intolerable.[2] It is perhaps inevitable that the two values should clash, when a zoning ordinance attempts to limit the freedoms of those involved in expressing unpopular views.[3] A body of first amendment/zoning jurisprudence has thus emerged, in an attempt to reconcile this potential for conflict.[4] Because the zoning law under attack in this case—the recently enacted "sexually oriented business" ordinance of the City of Dallas—follows the dictates of this recent hybrid body of law, it is consti-

1. *See Euclid v. Amber Realty,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) *and Lombardo v. Dallas,* 124 Tex. 1, 73 S.W.2d 475 (1934) (first establishing that zoning is a proper exercise of the police power), *overruling Spann v. Dallas,* 111 Tex. 350, 235 S.W. 513 (1921) (zoning as unauthorized intrusion on property rights); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974) (zoning may promote "family values [and] youth values"); *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954) (zoning may promote values that "are spiritual as well as physical, aesthetic as well as monetary"); *Stansberry v. Holmes,* 613 F.2d 1285, 1288 (5th Cir.), *cert. denied,* 449 U.S. 886, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980) ("zoning provides one of the firmest and most basic of the rights of local control").

2. *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) ("the ultimate good desired is better reached by free trade in ideas"); *Whitney v. California,* 274 U.S. 357, 374, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) (state is "denied the power to prohibit dissemination of social, economic, and political doctrine which a vast majority of its citizens believes is false and fraught with evil consequence"); *United States v. Schwimmer,* 279 U.S. 644, 654–55, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929) (Holmes, J., dissenting) (constitution embodies principle of "free thought—not free thought for those who agree with us but freedom for the thought we hate"); *Brandenburg v. Ohio,* 395 U.S. 444, 449, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969) (Ku Klux Klan); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969) (the "right to receive information and ideas, regardless of their social worth, is fundamental"); *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) ("in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated"); *Heffron v. International Soc'y for Krishna Consciousness,* 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1982); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984).

3. *See Goldman v. Weinberger,* —— U.S. ——, ——, 106 S.Ct. 1310, 1321, 89 L.Ed.2d 478, 54 U.S.L.W. 4298, 4304 (U.S.1986) (Brennan, J., dissenting) ("in pluralistic societies such as ours, institutions dominated by a majority are inevitably, if inadvertently, insensitive to the needs and values of minorities when these needs and values differ from those of the majority").

4. *See Young v. American Mini-Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *New York v. Uplinger,* 467 U.S. 246, 104 S.Ct. 2332, 81 L.Ed.2d 201 (1984); *City of Renton v. Playtime Theatres, Inc.,* —— U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *New York v. P.J. Video,* —— U.S. ——, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986); *Arcara v. Cloud Books, Inc.,* —— U.S. ——, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986); *Basiardanes v. City of Galveston,* 682 F.2d 1203 (5th Cir.1982); *Stansberry v. Holmes,* 613 F.2d 1285 (5th Cir.), *cert. denied,* 449 U.S. 886, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980); *Hart Bookstores v. Edmisten,* 612 F.2d 821 (4th Cir.1979), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); *Genusa v. City of Peoria,* 619 F.2d 1203 (7th Cir.1980); *Northend Cinema, Inc. v. Seattle,* 90 Wash.2d 709, 585 P.2d 1153 (1978), *cert. denied sub nom. Apple Theatre v. Seattle,* 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979). *See also United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Schad v. Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Erznoznick v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

tutional, except for the four minor exceptions discussed below.[5]

## I. The Ordinance

On June 12, 1986, the Dallas city attorney presented a proposed ordinance regulating sexually oriented businesses to the Dallas City Plan Commission. The Commission considered studies carried out in other cities, but did not undertake a study of Dallas. *See* Defendants' Exhibit (DX) 6 (Austin), DX 7 (Indianapolis), and DX 11 (Los Angeles). The Commission did consider, however, a map of Dallas indicating areas in which sexually oriented businesses could locate under the proposed ordinance. *See* Transcript (DX 1) at 5, 30–33. The Commission also heard public testimony, both for and against the proposed ordinance. *See id.* at 11–51. The Commission voted unanimously to recommend adoption of an ordinance regulating sexually oriented businesses.[6]

The Ordinance went before the Dallas City Council on June 18, 1986. The Council considered the three studies that were before the Commission, *see* Transcript (DX 17) at 3. The Council also considered a Dallas study comparing crime rates in two commercial sections, one with sexually oriented businesses and one without. *See id.* at 3 (finding crime rates 90 percent higher in adult district). After hearing public comment—unanimously in favor of the ordinance—the Council adopted it by unanimous vote. *See id.* at 28. Both representative bodies were in unanimous accord on the benefits of the ordinance.

**Legislative intent.** Divining the intent of a legislative body is inherently problematic,[7] but the intent of both the Commission and the Council in adopting the Ordinance is transparently clear. Five of the 15 members of the Commission [8] and four of the 11 members of the Council [9] stated unequivocally—to no dissent—that the Ordinance was concerned solely with controlling the secondary effects of sexually oriented businesses on surrounding neighbor-

---

5. This opinion resolves the case on cross-motions for summary judgment, because there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Dallas sexually oriented business ordinance is attached as Appendix A.

6. The rubric of "sexually oriented business" was apparently adopted not because it yielded a snappy, if somewhat unfortunate, acronym ("S.O.B."), but because a witness before the Commission testified that the alternative term, "adult entertainment," is one "that the pornographers invented to sort of dilute the anguish that people would have if they knew what was actually going on in these places." Transcript (DX 1) at 15 (testimony of Elvin Arnold, Dallas Ass'n for Decency); *see also* DX 17 at 4 (reflecting cause for name change was Arnold's testimony).

7. Determining legislative intent here does not involve the thorny problems courts have associated with drawing intent from incomplete journals of congressional debates. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); *Aldridge v. Williams,* 3 How. (44 U.S.) 9, 24, 11 L.Ed. 469 (1845); *Blitz v. Donovan,* 740 F.2d 1241, 1247 (D.C.Cir.1984); *Northern Colo. Water Conservancy Dist. v. Federal Energy Regulatory Comm'n,* 730 F.2d 1509, 1518 (D.C.Cir.1984) (Wright, J.); *see also* Marc N. Garber & Kurt A. Wimmer, *President's Statements at Signings No Help to*

*U.S. Judges,* 8(52) NAT'L L.J. 15, 42 (Sept. 8, 1986). The record here reflects the entire remarks of each legislator and witness, and the Court may divine intent from the proceedings as an integrated whole.

8. *See* Commission Transcript (DX 1) at 23 (Albright: "it isn't the product itself that we're attempting to address here, but rather it's the problems that are caused by a certain type of business"); *id.* at 48 (Averitt: "we're not deciding today whether people should or should not read, watch, do any of these activities"); *id.* at 49–50 (Albright: "the content has absolutely nothing to do with it"); *id.* at 51–52 (Wynne: "compelling government objective [is] controlling the crime associated with the concentration of commercial establishments of this type"); *id.* at 57–58 (Garrigan: "adverse effect that the business of selling pornography has on the surrounding community"); *id.* at 58–59 (Letot: "property values, neighborhood blight, crime").

9. *See* Council Transcript (DX 17) at 6 (Holcomb: "these types of establishments causing crime"); *id.* at 23–25 (Ragsdale: adult motels "continue to ... increase the crime"); *id.* at 25–26 (Richards: "this is part of our anti-crime package"); *id.* at 26 (Palmer: "clearly, I think that the intent of this ordinance is to reduce crime. It is clearly to reduce urban blight and to reduce the possibility of the deterioration of economic values, both in businesses as well as in residences").

hoods.[10] Both groups stated that they were concerned not with the content of the speech associated with sexually oriented businesses, but with the crime, urban blight, and plummeting property values that inevitably seize the neighborhoods where such businesses locate. It is of no moment that the public speakers in favor of the Ordinance supported it almost singularly in hopes that it would indeed suppress the speech purveyed by sexually oriented businesses,[11] as neither the Council nor the Commission relied on the specious view that pornography "causes" various social ills and should thus be eliminated.[12] The

10. This was also the clear intent of the drafter of the ordinance. *See* Affidavit of Analeslie Muncy (DX 3). Moreover, each of the three studies considered by both the Commission and the Council came to the conclusion that sexually oriented businesses were associated with rising neighborhood crime rates and dropping neighborhood property values. *See* DX 6 (Austin: appraisers found "negative impact" on property values and police found crime rate at "nearly double" the whole-city rate); DX 7 (Indianapolis: sex-related crime rate is 77 percent higher in adult area, and property appreciated at only one-third to one-half the city rate); DX 11 (Los Angeles, noting increase in crime but not entirely conclusive on property values in all areas). Other studies, both those explicitly relied on by the drafters and those not used, come to similar conclusions. *See* DX 8 (Houston); DX 9 (Beaumont); DX 10 (Amarillo); DX 12 (Phoenix); DX 13 (Las Vegas); DX 14 (Seattle).

Most importantly, the study performed of a section of Dallas—albeit a small and perhaps not entirely representative section—determined that crime in an area dominated by sexually oriented businesses was 90 percent higher than in the city as a whole. *See* Study (DX 20); *see also* Affidavit of Rick Stone (DX 19) (methodology). A similar but more anecdotal study, carried out by the Sheraton-Mockingbird hotel, demonstrated substantial crime in its vicinity arguably generated by the presence of sexually oriented businesses. *See* Sheraton Study (DX 22); *see also* Affidavit of J.W. Vandeveer (DX 21).

11. There is little doubt that the most vocal supporters of the ordinance—from such groups as the Dallas Association for Decency, the American Renewal Foundation, and the Citizens for Decency Through Law—applauded the ordinance for its incidental impact on speech. Although such witnesses may have had the intent to "zone [sexually oriented businesses] out of existence" by a law that was the "strongest vehicle toward elimination" of such businesses, *see* DX 6 at 3 (remarks of Atlanta city attorney that formed basis for finding of improper motive, *see Purple Onion, Inc. v. Jackson,* 511 F.Supp. 1207 [N.D.Ga.1981]), the City evinced no such illegal motive. *Cf.* Weinstein, *Regulating Pornography: Recent Legal Trends,* LAND USE LAW, February 1982, at 4. No inquisition into the "true" intentions of the legislators is warranted here, *cf. Arlington Heights v. Metropoli-*

*tan Housing Corp.,* 429 U.S. 252, 270, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977), as the operative effect of the law and the statements of the legislators indicate that the purpose of the law was permissible. *See Palmer v. Thompson,* 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971), *Washington v. Davis,* 426 U.S. 229, 243, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976) ("operative effect of the law rather than its purpose is the paramount factor").

12. *Cf.* U.S. Department of Justice, ATTORNEY GENERAL'S COMMISSION ON PORNOGRAPHY, FINAL REPORT 305 (Washington, D.C.: Government Printing Office, July 1986) (relied upon by defendants). In this connection, the Dallas City Council and Plan Commission could instruct the Meese Commission on the difference between correlation and causation. The critical inquiry here is whether secondary effects are associated with speech, *see Renton v. Playtime Theatres,* —— U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The Meese Commission—which performed *no* original research—ignored decades of scientific evidence to conclude that pornography "causes" crime. *But see, e.g.,* Malamuth & Donnerstein, *The Effects of Aggressive-Pornographic Mass Media Stimuli,* 15 ADVANCED AND EXPERIMENTAL SOCIAL PSYCHOLOGY 103 (1982); Malamuth & Feshbach, *Testing the Hypotheses Regarding Rape: Exposure to Sexual Violence, Sex Differences, and the Normality of Rapists,* 14 JOURNAL OF RESEARCH IN PERSONALITY 121 (1980); Malamuth, *Rape Fantasies as a Function of Exposure to Violent Sexual Stimuli,* 10 ARCHIVES OF SEXUAL BEHAVIOR 33 (1981); Commission on Obscenity and Pornography, REPORT (1970) ("erotic material is [not] a significant cause of sex crime").

There is a concurrent judicial recognition that the tenuous link between pornography and crime is not sufficiently established to form the basis of any sound public policy. *See, e.g., Stanley v. Georgia,* 394 U.S. 557, 567, 89 S.Ct. 1243, 1249, 22 L.Ed.2d 542 (1969) ("given the present state of knowledge, the State may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits"). Indeed, the premier case on pornographic literature pointed out that even the most innocuous—and, indeed, moral—material may lead to violent sex crime:

intent of the City in passing the Ordinance was solely to control the secondary effects of sexually oriented speech on the neighborhoods its purveyors inhabit, rather than to eliminate the speech itself.

**The Council's findings.** The Ordinance enacted by the City incorporated several findings. The City first found that it has authority to regulate businesses pursuant to its police power, and that licensing is a reasonable means to ensure that subject businesses comply with regulations. *See* Ordinance (DX 16) at 2. The Council then found that a substantial number of sexually oriented businesses require regulation to protect the "health, safety, and welfare" of the establishments' patrons and citizens in general. Public safety authorities should regulate such businesses, the Council reasoned, because the businesses "are frequently used for unlawful sexual activities, including prostitution and sexual liasons of a casual nature" and because of the "concern over sexually transmitted disease." *Id.* The Council next found that arrests for sex-related crimes near sexually oriented businesses have been "substantial," and that there is "convincing documented evidence" that sexually oriented businesses are associated with falling property values of surrounding business and residential areas. Then, the Council found that when such businesses are located in close proximity to one another, "urban blight" and a decrease of the quality of life in adjacent

areas results. Finally, the Council stated that its intent was to minimize these adverse effects, thus preserving property values in surrounding neighborhoods, detering the spread of urban blight, and decreasing crime. *Id.* at 5. The Council emphasized, however, that it did not intend to limit access by adults to sexually oriented material protected by the first amendment. *Id.*[13]

**The Ordinance's terms.** Based on these findings, the Council enacted an ordinance that pervasively regulates the operation of all sexually oriented businesses in Dallas. The most important changes made by the Ordinance, which is discussed in detail with the relevant arguments, are (1) strict locational prohibitions, including the requirement that a business be at least 1,000 feet from another sexually oriented business, or a church, school, residential area, or park;[14] (2) required licensing and inspection for all regulated businesses; (3) disqualification from licensure of any applicant who has been convicted of a specified crime, or whose spouse has been so convicted; (4) requirements that all patrons in an arcade—even if within a closed booth—be within the sight of a manager; and (5) various layout, furnishing, hiring, and lighting restrictions on regulated businesses.

## II. The Plaintiffs

The plaintiffs in this case operate seven of the nine types of sexually oriented busi-

---

Heinreich Pommerenke, who was a rapist, abuser, and mass slayer of women in Germany, was prompted to his series of ghastly deeds by Cecil B. Demille's *The Ten Commandments.* During the scene of the Jewish women dancing about the Golden Calf, all the doubts of his life came clear: women were the source of the world's trouble and it was his mission to both punish them for this and to execute them. Leaving the theater, he slew his first victim in a park nearby. John George Haigh, the British vampire who sucked his victims' blood through soda straws and dissolved their drained bodies in acid baths, first had his murder-inciting dreams and vampire longings from watching the 'voluptuous' procedure of—an Anglican High Church Service!

*Memoirs v. Massachusetts,* 383 U.S. 413, 432 n. 11, 86 S.Ct. 975, 984 n. 11, 16 L.Ed.2d 1 (1966) (Douglas, J., concurring), *quoting* Murphy, *The*

*Value of Pornography,* 10 Wayne L.Rev. 655, 668 (1964).

Based on this false and largely discredited causal nexus, the Meese Commission recommends the constitutionally suspect course of eliminating the speech rather than eliminating its secondary effects—the better course, followed here.

13. The Ordinance makes it a defense that "each item of descriptive, printed, film, or video material offered for sale or rental, taken as a whole, contains serious literary, artistic, political, or scientific value." Ordinance at 41A–21(e); *see also Roth v. United States,* 354 U.S. 476, 489, 77 L.Ed.2d 1304, 1311, 1 L.Ed.2d 1498 (1957).

14. The "location" restriction also provides that there may not be more than one sexually oriented business "in the same building, structure, or portion thereof." *See* Ordinance, section 41A–13(c).

nesses classified in the Ordinance: (1) adult arcades; (2) adult bookstores or adult videostores; (3) adult cabarets; (4) adult motels; (5) adult motion picture theatres; (6) adult theatres; and (7) nude model studios. There are no escort agencies or sexual encounter centers that have appeared to challenge the Ordinance.[15]

Under section 41A–13(f) of the Ordinance, each business is deemed a "nonconforming use" because of its location within 1000 feet of another sexually oriented business, or a church, school, residential district, or park. The plaintiffs may continue their business for a period of three years from June 18, 1986, unless "sooner terminated for any reason or voluntarily discontinued for a period of 30 days or more." Plaintiffs are also prohibited from "increasing, extending, or altering" their businesses unless they are changed to a conforming use. At the conclusion of the three-year period under 41A–13(f), only the "first-established and continually operating" sexually oriented business at a particular location may continue to operate—so that the dispersal of sexually oriented businesses in Dallas will be completed by June 18, 1989.[16]

The Ordinance would force many plaintiffs to relocate. Many are near specified-use areas; others are within 1000 feet of one another—as are plaintiffs Deja Vu, Texas Rose, Baby Dolls Saloon, Million Dollar Saloon II, Expose, and Bachman Cafe. The relocation provisions threaten the businesses with enormous expenditures; many have great investments in their locations and the value of their property—such as S.B. Sugars, Inc., which has obtained financing on a parking lot valued at $1,000,000. Other plaintiffs face economic hardship from the Ordinance's restrictions on their activities. Adult motels, for example, will be restricted to renting rooms for at least ten hours, rather than the two-hour period common now—thus cutting their income by up to 80 percent.

The main attack in this case is, therefore, the location restriction and the three-year amortization period of section 41A–13(f). Plaintiffs also level attacks against each provision of the Ordinance that applies to them, claiming that the Ordinance's provisions are vague and overbroad, that its licensure requirement is unconstitutional, that it vests overbroad discretion in the Chief of Police, and that the Ordinance is not sufficiently related to the City's objectives.

### III. Standing

As a threshold issue, the City makes the argument—apparently one considered obligatory in cases such as this—that various defendants have no standing to challenge the Ordinance. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1666, 75 L.Ed.2d 675 (1983); *Brown v. Edwards,* 721 F.2d 1442, 1446–47 (5th

---

**15.** Even if representatives of each of the two absent sexually oriented businesses were present, it would not affect the constitutionality of the Ordinance. There is some question, however, about the vagueness and breadth of the primary business purpose of a sexual encounter center: "activities between male and female persons and/or persons of the same sex when one or more of the persons is in a state of nudity or semi-nude." Ordinance, 41A–2(16)(B). Although defendants broadly assert that "such businesses are not entitled to first amendment protections anyway," Response at 3 n. 1, *citing Stansberry v. Holmes,* 613 F.2d 1285 (5th Cir.), *cert. denied,* 447 U.S. 929, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980), the businesses are certainly entitled to fair notice that their conduct is prohibited by statute, *see Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971). As the issue is not squarely presented to the Court, it need not be resolved.

**16.** A sexually oriented business that has been denied licensure because of location restrictions may apply for an exemption under section 41A–14. The application is decided by a permit and license appeal board, with reference to enumerated findings required by the Ordinance. An exemption may only allow operation of a sexually oriented business for 12 months, at which time the business may apply for another exemption. The standards set forth in this section are drawn almost verbatim from *Young,* 427 U.S. at 54 n. 7, 96 S.Ct. at 2444 n. 7. If the City improperly denies a request for exemption—e.g., by failing to apply the *Young* standards in section 41A–14—the applicant has recourse in a state court suit, by showing that the City's denial is not supported by "substantial evidence," *see post* at 1071 n. 26.

Cir.1984). Moreover, the City claims that the plaintiffs' challenges are not ripe, because there is no "real and immediate threat" of closure of their businesses. Plaintiffs do not, however, present "abstract" questions of possible injuries. There is no doubt that the Ordinance, once effective, would pervasively change the manner in which each plaintiff runs his or her business; many would close. "It is clear that a party may challenge a licensing statute regardless of whether he or she was denied a permit, or whether one has ever been sought." *Fernandes v. Limmer,* 663 F.2d 619, 625 (5th Cir.1981); *see also Star Satellite, Inc. v. City of Biloxi,* 779 F.2d 1074, 1078 (5th Cir.1986); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). The City's position amounts to a claim that plaintiffs' attacks could be asserted as a defense to an eventual state prosecution for defiance of the Ordinance. Such a forum would not, however, protect plaintiffs' rights. *See Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (defense in state suit "will not assure adequate vindication of constitutional rights ... a substantial loss of or impair-

ment of freedoms of expression will occur if appellants must await the state court's disposition"); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973); *Gerstein v. Pugh,* 420 U.S. 103, 108 n. 9, 95 S.Ct. 854, 860 n. 9, 43 L.Ed.2d 54 (1975). No state prosecution is underway, and the complete determination of plaintiffs' claims here will aid and expediate the City's efforts, rather than delaying and hindering them.[17] *Cf. Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604–05, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975); *Trainor v. Hernandez,* 431 U.S. 434, 446 & n. 8, 97 S.Ct. 1911, 1919 & n. 8, 52 L.Ed.2d 486 (1977). Under the factual allegations presented, plaintiffs do have standing to challenge the Ordinance and their challenge is ripe for determination.

## IV. Constitutionality

 Regardless of the Ordinance's focus on the secondary effects of sexually oriented businesses, there is no doubt that its terms have an incidental impact on expression that is protected by the first amendment.[18] Because of this impact, it is

17. A delayed and piecemeal determination of plaintiffs' constitutional claims would not serve the City. As counsel agreed in chambers when this Court set an accelerated schedule for resolving this controversy on cross-motions for summary judgment, a wholesale determination of the Ordinance's validity would permit orderly enforcement of the law *and an expedited appeal,* and save both the plaintiffs and the City substantial funds alloted in anticipation of protracted litigation. *See* DX 17 at 27–29.

18. *See, e.g., Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981); *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); *Joseph Burstyn, Inc., v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). The City does not allege that the conduct in which plaintiffs engage involves obscenity, which is prohibited by separate statute and which may permissibly be prohibited because it is not protected by the first amendment. *See Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ("obscene material is unprotected by the first amendment"); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *see also New York v. Ferber,* 458 U.S. 747, 757, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113

(1982) (child pornography is outside the protections of the first amendment). Nor does the City advocate the novel—and largely unsupportable—position that pornography is, like obscenity, outside the bounds of the first amendment. *Cf.* Schauer, *Speech and "Speech"—Obscenity and "Obscenity:" An Exercise in the Interpretation of Constitutional Language,* 67 Ga.L.J. 899 (1979); Finnis, *Reason and Passion: The Constitutional Dialectic of Free Speech and Obscenity,* 116 *U.Pa.L.Rev.* 222 (1967); Attorney General's Commission on Pornography, *ante* at 6 n. 12, at 260–262 (section entitled "Is the Supreme Court Right," claiming that "the bulk of scholarly commentary is of the opinion that the Supreme Court's resolution of and basic approach to the first amendment issues is incorrect"), *citing* Henkin, *Morals and the Constitution: The Sin of Obscenity,* 63 *Colum.L.Rev.* 391 (1963). *See also Memoirs v. Massachusetts,* 383 U.S. 413, 453, 86 S.Ct. 975, 994, 16 L.Ed.2d 1 (1966) (Clark, J., dissenting) (justifying controlling "erotic and pornographic material" by reference to obscenity's status as non-first-amendment material), *citing* Hoover, *Combating Merchants of Filth: The Role of the FBI,* 25 *U.Pitt.L.Rev.* 469 (1964), Hoover, *The Fight Against Filth, The American Legion Magazine* (May 1961).

appropriate to analyze the statute under the four-part test of *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). *See City of Renton v. Playtime Theatres, Inc.,* —— U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres*, 427 U.S. 50, 79, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976) (Powell, J., concurring). Under the *O'Brien* test, regulation is justified despite its impact on first amendment interests "[1] if it is within the constitutional power of the government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on ... first amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679. Incidental burdens on free expression may be analyzed under this test as time, place, and manner regulations. *Renton*, 106 S.Ct. at 927.[19] The first three elements may be considered without reference to the specific requirements of the Ordinance; a determination of whether the Ordinance's particular terms follow the least restrictive means available must, however, be made independently for each of the Ordinance's restrictions.

First, it is without doubt that the police power of the City encompasses the power to enact a zoning and regulatory ordinance such as that considered here. *See ante* at 1063 n. 1; *see also Renton*, 106 S.Ct. at 927 (similar ordinance within police power). Second, the interests the City studied and intended to further by the Ordinance—crime control, protection of property values, and prevention of urban blight, *see ante* at 1064 & nn. 8–9—are both important and substantial. *See Young*, 427 U.S. at 79, 96 S.Ct. at 2456 (Powell, J., concurring).[20] Third, the intent of the City—garnered from complete reports of both the Plan Commission and City Council proceedings—demonstrates that the governmental interest was unrelated to the suppression of free expression. *See ante* at 1064–65 nn. 8–10. The legislative response to the secondary effects of sexually oriented businesses evinced a clear intent to leave alternative avenues open for expression of that genre, while lessening the effects of such businesses on the surrounding community.[21] The first three elements of the *O'Brien* test are satisfied; evaluation of the fourth factor requires

**19.** Time, place, and manner restrictions are permissible if they are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984); *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). *But see Renton* 106 S.Ct. at 932 (Brennan, J., dissenting) (zoning adult businesses necessarily content-based).

**20.** Indeed, the three governmental interests sought to be advanced by the Ordinance are at the very heart of the rationale for allowing local governments the power to zone:

It [is] undeniable that zoning, when used to preserve the character of specific areas of a city, is perhaps "the most essential function performed by local government, for it is one of the primary means by which we protect that sometimes difficult concept of quality of life."

*Young*, 427 U.S. at 80, 96 S.Ct. at 2457 (Powell, J., concurring), *quoting Village of Belle Terre v. Boraas*, 416 U.S. at 13, 94 S.Ct. at 1543; *see also ante* at 1063 n. 1.

**21.** The unanimity of permissible intent here far surpasses that upheld by the Supreme Court in passage of the *Renton* ordinance; the combination of legislative study and intent demonstrated here might even satisfy the standards of Justices Brennan and Marshall in dissent. Although the impetus for this result may be the particular type of content conveyed by such businesses, the government may permissibly tailor its reaction to different messages according to the degree to which its interests are implicated. *See Young*, 427 U.S. at 82 n. 6, 96 S.Ct. at 2458 n. 6 (Powell, J., concurring), *citing Tinker v. Des Moines School Dist.*, 393 U.S. 503, 509–11, 89 S.Ct. 733, 737–38, 21 L.Ed.2d 731 (1969); *Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); *Greer v. Spock*, 424 U.S. 828, 842–44, 96 S.Ct. 1211, 1219–20 (1976) (Powell, J., concurring).

reference to each challenged section of the Ordinance.

■ *Locational restrictions.* The element of the Ordinance that is most vigorously challenged is the one element that is least susceptible to challenge after *Young* and *Renton.* Section 41A–13 states that a sexually oriented business cannot be located within 1000 feet of (1) a church; (2) a public or private elementary or secondary school; (3) a boundary of a residential district; (4) a public park adjacent to a residential district; (5) the property line of a lot devoted to residential use; or (6) another sexually oriented business. If a regulated business is currently in violation of this section, it is deemed a nonconforming use and allowed to continue to operate for three years. A properly located regulated business is not rendered a nonconforming use by the subsequent location of a church, school, park, or residential area within 1000 feet of the business.

No doubt remains after *Renton* and *Young* that dispersed zoning of sexually oriented businesses is permissible, provided that "reasonable alternative avenues of communication" exist. *See Renton,* 106 S.Ct. at 928; *see also Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 75–6, 101 S.Ct. 2176, 2186, 68 L.Ed.2d 671 (1981); *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). In *Young,* a Detroit zoning plan similar to that challenged here was approved, but "[t]he situation would have been quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." *Id.* 427 U.S. at 71 n. 35, 96 S.Ct. at 2453 n. 35; *accord, Basiardanes v. City of Galveston,* 682 F.2d 1203, 1214 (5th Cir.1982) (only "oppressive options remained to an aspir-

ing promoter of adult films"); *Olmos Realty Co. v. State,* 693 S.W.2d 711, 714 (Tex. Civ.App.—San Antonio, no writ); *Keego Harbor Co. v. Keego Harbor,* 657 F.2d 94 (6th Cir.1981) (ordinance prohibited all theatres); *Alexander v. City of Minneapolis,* 698 F.2d 936, 937–38 (8th Cir.1983) (ordinance led to closing all theatres); *Purple Onion, Inc., v. Jacksonville,* 511 F.Supp. 1207, 1217 (N.D.Ga.1981) (sites either "unavailable, unusable, or so inaccessible to the public [that] they amount to no locations"); *Renton,* 106 S.Ct. at 938, 54 U.S.L.W. at 4167 (Brennan, J., dissenting) (must have "reasonable opportunity to operate"). The majority opinion in *Renton,* however, has made it clear that there need be only a "reasonable" opportunity to locate within the city; the Court expressly rejected findings of fact that the 520 acres left open by the ordinance was not truly "available" for regulated use.[22]

The land available for sexually oriented businesses under the Dallas ordinance is substantial, and satisfies *Basiardanes* and *Renton.* The maps considered by the City upon enacting the Ordinance detail several areas that are open to sexually oriented businesses, and it cannot be said that a "reasonable" opportunity for such businesses does not exist under the Ordinance. The plan adopted by Dallas differs markedly from the Galveston plan rejected in *Basiardanes,* 682 F.2d at 1214; that plan incorporated an outright ban on 85–90 percent of the city's total area, and the remaining areas, located "among warehouses, shipyards, undeveloped areas, and swamps," were reached by "few access roads." *Id.* The Dallas plan, in contrast, permits location in several areas stretching from the inner city area to the north and south suburbs, accessed by such major

---

**22.** In *Renton,* the Court held that it was clearly erroneous for the circuit court to find the ordinance invalid because "practically none" of the available land was currently for sale or lease, and because there were no "commercially viable" locations left open by the ordinance. *See City of Renton v. Playtime Theatres, Inc.,* 748 F.2d 527, 534 (9th Cir.1985); *Renton,* 106 S.Ct. at 930. Rather than reviewing in detail the choices available to regulated businesses under

the ordinance, the Court stated that "the first amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theatre within the city." *Renton,* 106 S.Ct. at 930. The first amendment, the Court said, does not require that "speech-related businesses ... obtain sites at bargain prices," *id.,* but only that a city "make some areas available" for such businesses, *id.,* 106 S.Ct. at 932.

thoroughfares as Interstate 35, Interstate 30, Loop 12, Highway 183, and Harry Hines Boulevard. Eight to ten percent of the city's total area—21,000 acres—is available. *Cf. Renton,* 106 S.Ct. at 930 (5 percent). See DX 15; PX 1; DX 27. There is no impediment to the locational restrictions enacted in the Ordinance.[23]

■ The three-year amortization clause is also challenged. Such clauses, however, are uniformly upheld. *See Hart Bookstores v. Edmisten,* 612 F.2d 821, 830 (4th Cir.1979), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980) (upholding six-month amortization period); *Northend Cinema, Inc. v. Seattle,* 90 Wash.2d 709, 585 P.2d 1153, 1160 (1978), *cert. denied sub nom. Apple Theatre v. Seattle,* 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979) (upholding three-month amortization period); *see also* Note, *Using Constitutional Zoning to Neutralize Adult Entertainment—Detroit to New York,* 5 *Fordham Urban L.J.* 455, 472–74 (1977) (advocating one-year amortization period); *SDJ, Inc. v. City of Houston,* 636 F.Supp. 1359, 1371 (S.D.Tex.1986) (six-month period). *See generally Lubbock Poster Co. v. City of Lubbock,* 569 S.W.2d 935, 940–43 (Tex. Civ.App.—Amarillo, writ ref'd n.r.e.).[24] The period allowed by the Ordinance is more generous than others that have been upheld; it is a valid mechanism used to enforce valid locational regulations.[25]

**Licensure requirement.** Although there is no constitutional impediment to the concept of requiring sexually oriented businesses to obtain licenses [26] and pay reason-

---

**23.** Plaintiffs' exhibits 3, 4, and 5, and the Street Affidavit (Sept. 10, 1986), command no contrary result. These affidavits seek to establish that the areas left open by the Ordinance are undesirable as a matter of business judgment by those involved in sexually oriented businesses, but it is clear that *Renton* disavowed reliance on precisely such information. *See Renton,* 106 S.Ct. at 930–932.

**24.** Plaintiffs' exhibits 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, Affidavits of Bill Staten, Tracey Robertson, Beverly K. Van Dusen, Paul Radnitz, Bruce Wayne Logan, Gayla Marilynn Wolf, J.R. Estes, William C. Evert, Jr., Charles E. Carlock, and Plaintiffs' Statement of Impact all seek to establish that the period is invalid because of plaintiffs' pre-existing debts. Although the Ordinance will harm plaintiffs' profitability, the period is reasonable under accepted principles. *See City of University Park v. Benners,* 485 S.W.2d 773, 777–78 (Tex.1972); *Zahn v. City of Los Angeles,* 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927) (economic detriment to regulated industries permissible); *Ascarate v. Villalobos,* 148 Tex. 254, 223 S.W.2d 945, 950 (1949) (same). This is not a case where structures must be demolished to accomplish the state's reasonable exercise of police power, *cf. Lubbock Poster Co.,* 569 S.W.2d at 940; if it is not profitable for plaintiffs to relocate, the Ordinance does not prohibit them from using their established structures for other enterprises.

**25.** Equally valid is the section's provision for an exemption from location restrictions. Even if there were a constitutional entitlement to waiver provisions in an amortization period—which is doubtful, *see Northend Cinema,* 585 P.2d at 1159—the exemption utilized in this section is that upheld by the Supreme Court in *Young,* 427

U.S. at 56, 96 S.Ct. at 2445 (noting that court below rejected vagueness challenge to waiver provisions). Plaintiffs' argument that this section, like the licensure section, vests unbridled discretion in the Police Chief will be dealt with below, *see post* at 1072–73.

Moreover, the section of the Ordinance prohibiting more than one sexually oriented business from locating in the same building—section 41A–13(c)—is constitutional. *See Hart Bookstores v. Edmisten,* 612 F.2d 821 (4th Cir. 1979). As the City admitted at oral argument, it interprets the Ordinance to permit one business to deal in several different media; if the City reneges on this interpretation, it would be a simple matter for an applicant to claim in state court, *see Memet v. State,* 642 S.W.2d 518, 524 (Tex.Civ.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.), that the City is now estopped from changing the interpretation on which this Court based a finding of constitutionality. *See Hicks v. Harris,* 606 F.2d 65 (5th Cir.1979) (government may be estopped by official with authority).

**26.** Licensing, as plaintiffs concede, is a valid method of ensuring that regulated businesses abide by locational and other restrictions. *See Genuse v. City of Peoria,* 619 F.2d 1203, 1212–13 (7th Cir.1980); *see also Wall Distributors, Inc. v. City of Newport News,* 782 F.2d 1165, 1171 (4th Cir.1986); *SDJ, Inc. v. City of Houston,* 636 F.Supp. at 1368 (S.D.Tex.1986); *Schope v. State,* 647 S.W.2d 675 (Tex.Civ.App.—Houston [14th Dist.] 1982). *Entertainment Concepts, Inc. v. Maciejewski,* 631 F.2d 497 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981), holds nothing to the contrary; that court found a specific intent to suppress speech. *See id.* at 504.

able fees,[27] plaintiffs challenge the manner in which the licensing scheme is implemented and the qualifications the scheme imposes upon licensees. The challenge is sustained only as to subsections 41A–5(a)(8), 41A–5(a)(10)(B)(c), part of 41A–5(a)(10), and 41A–5(10)(A)(iii) and (vi)–(ix); the City will be enjoined from enforcing those sections, which may be easily severed from the remainder of the Ordinance.[28]

■ It is settled constitutional principle that any license requirement for an activity related to expression must contain narrow, objective, and definite standards to guide the licensing authority. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). The City argues that the Ordinance vests no discretion in the Chief of Police, as it states that he "shall" approve the issuance of a license "unless" a factual basis for denial exists. This assertion is largely correct, but it is a simplistic view of the actual operation of two subsections of the Ordinance. First, section 41A–5(a)(8) allows the police chief to deny a license to an applicant who has been employed in a sexually oriented business on a finding that "he is *unable* to operate or manage a sexually oriented business premises in a *peaceful* and law-abiding *manner*" (emphasis added).[29] Second, the Ordinance allows an applicant with a past conviction to be granted a license if the sufficient amount of time has elapsed, but section 41A–5(c) allows the police chief to grant a license to such an applicant "only if the chief of police determines that the applicant or applicant's spouse is *presently fit* to operate a sexually oriented business" (emphasis added). Neither section provides sufficiently definite standards to pass constitutional muster.

Both sections ask the police chief to make subjective judgments on the fitness of an applicant; neither, then, is controlled by standards "susceptible of objective measurement." *Keyishian v. Board of Regents*, 385 U.S. 589, 603–04, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967). The Ordinance is silent to what conduct may reasonably be considered operation of a business in a "peaceful manner."[30] The Ordinance is more specific in addressing the "present fitness" of an applicant with a past conviction; in at least one case, however, the specificity itself constitutes overbroad dis-

---

27. *See Genusa*, 619 F.2d at 1213 ($100); *Bayside Enterprises v. Carson*, 470 F.Supp. 1140, 1148–49 (M.D.Fla.1979) ($400); *Borrago v. City of Louisville*, 456 F.Supp. 30 (W.D.Ky.1978) ($250); *Airport Book Store v. Jackson*, 248 S.E.2d 623 (Ga. 1978) ($500). The license fee challenged here is valid; it is not excessive in view of the substantial administrative costs to be defrayed in the implementation of the Ordinance, *see Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), and is rationally related to the permissible purposes of the Ordinance. It is not, then, a tax levied on an expressive enterprise in violation of the first amendment. *Cf. Fernandes v. Limmer*, 663 F.2d 619, 632–33 (5th Cir.1982), *cert. dismissed*, 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 1369, 75 L.Ed.2d 295 (1983) ("it is beyond dispute that the states and the federal government can subject newspapers to generally applicable economic regulations without creating constitutional problems").

28. The constitutional infirmities identified could also be changed by amendment without significantly altering the Ordinance's purpose in light of the City's objectives.

29. This infirmity here is not repeated in the similar language of section 41A–9(5). That section allows a license to be suspended if a licensee has demonstrated an inability to operate a business "in a peaceful and law-abiding manner *thus necessitating action by law enforcement officers.*" This section is thus limited by its language to certain objective indications of an inability to operate a business peacefully.

30. Indeed, some may find the concept of "peaceful" operation of a sexually oriented business to constitute an oxymoron, in light of recent challenges claiming that pornography is invariably violent to women. *See American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323 (7th Cir. 1985) (rejecting Minneapolis ordinance as "thought control"); Callahan, *Women and Pornography, American Film*, March 1982, at 63. Although this view has been invalidated, there is little in the Ordinance to keep similar subjective views from being grounds for license denial (would operating business catering to sadists or masochists, for example, be "peaceful"?).

cretion—one factor the police chief is to take into account is "the amount of time that has elapsed since his last criminal activity." *See* subsection 41A–5(c)(3). Under this subsection, then, the police chief is permitted to extend indefinitely the periods specifically enumerated by the Ordinance in subsections 41A–5(a)(10)(B)(i–iii). By reference to the "extent and nature" of the applicant's past criminal activity, *id.* at 41A–5(c)(1), the applicant's age at the time of the offense, *id.* at 41A–5(c)(2), the applicant's "conduct and work activity," *id.* at 41A–5(c)(4), evidence of the applicant's "rehabilitation," *id.* at 41A–5(c)(5), and letters "from prosecution, law enforcement, and correctional officers," *id.* at 41A–5(c)(6), then, the police chief may determine that an applicant will not be granted a license. These two subsections vest unfettered discretion in the police chief, and cannot survive constitutional scrutiny.[31]

Shorn of the two sections that vest subjective and unguided authority in the police chief, however, the largest part of the licensure section is constitutional. The findings the police chief must make in licensing sexually oriented businesses are based on objectively determinable facts, and are thus permissible. *See Memet v. State,* 642 S.W.2d 518, 524 (Tex.Civ.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Schope v. State,* 647 S.W.2d 675, 680 (Tex.Civ.App.

—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Age restrictions are factually based, see subsection 41A–5(a)(1), as are determinations of past due fees and taxes, *see id.* at 41A–5(a)(2), and false statements on application forms, *see id.* at 41A–5(a)(3),[32] *see Schope,* 647 S.W.2d at 680 (upholding ordinance including such factors); *Bayside Enterprises v. Carson,* 470 F.Supp. 1140, 1148 (M.D.Fla.1979) (upholding unpaid tax or fee provision); *Genusa,* 619 F.2d at 1219–20 (upholding provision for false statements). Failure to comply with the Ordinance, subsections 41A–5(a)(4) and (9), may be objectively verified, as may approval of premises by health, fire, and building officials, subsection 41A–5(a)(6). *See SDJ, Inc. v. City of Houston,* 636 F.Supp. at 1368–69 (S.D. Tex.1986). Whether an applicant resides with someone who has been recently denied a license or whose license has been revoked,[33] subsection 41A–5(1)(5), may be objectively verified. Finally, although this Court agrees that "persons with prior criminal records are not first amendment outcasts," *Fernandes v. Limmer,* 663 F.2d 619, 630 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982), denial of licensure to those convicted of certain specified crimes that are related to the crime-control intent of the law is undoubtedly permitted.[34]

---

**31.** The infirmity could easily be cured by amendment. Section 41A5(a)(8) could be limited to arrest or police action, as is section 41A–9(5); section 41A–5(c) could be limited to the same elapsed-time standard of section 41A–5(B).

**32.** This subsection is not invalidated by *Doe v. City of Buffalo,* 56 N.Y.2d 926, 453 N.Y.S.2d 605, 439 N.E.2d 321 (1982). The language before the New York Court of Appeals provided that "such other information" as the licensing authority might require must be provided. Here, however, the further information that may permissibly be required of an applicant is limited to that "reasonably necessary for issuance of the license." It is thus limited to information the police chief may need to determine whether an applicant is in compliance with other provisions of the Ordinance, and does not confer "open-ended discretionary power." *Doe,* 56 N.Y.2d at 929, 453 N.Y.S.2d at 606, 439 N.E.2d at 322.

**33.** This provision is apparently meant to prevent rejected applicants from skirting the intent of

the law by simply recruiting housemates, *see Fischer v. Dallas Federal Savings & Loan Ass'n,* 106 F.R.D. 465, at 469 n. 5 (N.D.Tex. June 18, 1985) ("there's *nothing that I wouldn't do* / if you would be my POSSLQ"), to become "licensees" on behalf of the disappointed applicant. It is thus permissible; although a freedom-of-association challenge could be mounted to the subsection, its success would be most doubtful after *Lyng v. Castillo,* — U.S. —, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986) (Stevens, J.) (statutory classification based on living arrangement upheld). Indeed, the language of which plaintiffs complain was taken from two other ordinances that have been applied to plaintiffs for years: the theater ordinance, section 46–4(a)(7), and the dance-hall ordinance, section 14–3.

**34.** This principle was squarely addressed in *Arcara v. Cloud Books, Inc.,* — U.S. —, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (Burger, C.J.), in which the Court held that a sexually related business could be closed when management was

■ Five enumerated crimes, however, are not sufficiently related to the purpose of the Ordinance to withstand scrutiny. Although thirteen of the offenses are clearly related to the purpose of the Ordinance as it was debated by the City, no findings exist to justify prohibiting one convicted of (1) a controlled substances act violation, (2) bribery, (3) robbery, (4) kidnapping, or (5) organized criminal activity from obtaining a license to operate a sexually oriented business. In the absence of such findings, this Court cannot say that the offenses enumerated are sufficiently related to the purpose of the Ordinance—either for constitutional purposes, or for purposes of the City's authority under Texas law. *See Young,* 427 U.S. 50, 56 n. 11, 96 S.Ct. 2440, 2445 n. 11;[35] *see also Tex.Civ.Stat.Ann.* art. 6252–13c (supp.1986) (denial of license proper only if crime "directly relates to an occupation"). Subsections 41A–5(a)(10)(A)(iii), (vi), (vii), (viii) and (ix) are

thus constitutionally and statutorily invalid.

■ The language of subsection 41A–5(a)(10) that compels the police chief to deny licensure to an applicant "under indictment or misdemeanor information" for a specified crime must also fail. Although the City undoubtedly has a legitimate interest in preventing one convicted of a specified crime from holding a license, *see ante* at 1073 and n. 34, denial on the basis of mere indictment or information cannot pass constitutional scrutiny.[36] An indictment or information is not evidence of an applicant's guilt, but merely indicates that an *ex parte* procedure navigated solely by a prosecutor has resulted in a finding of probable cause. *See United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). The simple act of indictment or information cannot carry the heavy burden implicit in suppressing speech that is protected by the first amendment,[37] and may implicate overbreadth in

---

aware of sexual behavior on the premises, in violation of law. *See id.* 106 S.Ct. at 3176, at 5062. If violation of law by a licensee may permissibly justify closure, it follows inescapably that one who has been convicted of a sex-related crime may be denied licensure. *Accord, 106 Forsyth Corp. v. Bishop,* 482 F.2d 280, 281 (5th Cir.1973), *cert. denied,* 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975); *Borrago v. City of Louisville,* 456 F.Supp. 30, 32 (W.D.Ky. 1978); *Airport Bookstore, Inc. v. Jackson,* 248 S.E.2d 623 (Ga.1978), *cert. denied sub nom. Gateway Books v. Jackson,* 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979). One intent of the law was to prevent crime; the Ordinance considers only certain crimes to be relevant—such as prostitution, obscenity, or child pornography, *see* Ordinance at 41A–5(a)(10)(a). It allows even those convicted of such offenses to be licensed after a certain amount of time has elapsed, *see id.* at 41A–5(a)(10)(B). It is thus narrowly tailored to avoid licensure of those who have recently shown a predilection toward the criminal conduct the Ordinance was designed to overcome.

**35.** The operation of these subsections against the plaintiffs present in this case demonstrates that the effect they would have upon applicants is quite real. Gayla Marilynn Wolf, an owner of a video concern, has been convicted of robbery, *see* Wolf Affidavit at 3; and William C. Evert, Jr., an owner of a bookstore, has been convicted of a controlled substances act violation, *see* Evert Statement at 5.

**36.** Denial of licensure on the basis of investigation into a crime constitutes punishment without the requisite finding of guilt. "Our system of justice reserves punishment to those who have been convicted—beyond a reasonable doubt—of an offense; collateral punishment without process has no place in our constitutional scheme." *Parks v. Rogers,* —— F.Supp. —— CA3–85–1411–R, slip op. at 3 (N.D.Tex. 1986); *see also Branzburg v. Hayes,* 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972) (grand jury serves "as a protector of citizens against arbitrary and oppressive governmental action").

**37.** This aspect of the Ordinance is not a content-neutral time, place, and manner restriction on protected speech; denial of a license amounts to an absolute suppression of expression. "In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the first amendment without bearing the burden of showing that its restriction is justified." *Philadelphia Newspaperw v. Hepps,* —— U.S. ——, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986). *Cf. Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (procedural rules ordinarily valid may be barred because of the threat to first amendment rights). Surely this burden cannot be carried by a bare statement of probable cause.

chilling protected speech.[38] Dispositively, however, the prohibition against licensure of one under indictment or information fails the fourth *O'Brien* test in that less restrictive means of accomplishing the legislative goal exist. If the City intends to forestall revocation procedures against one who is eventually convicted of a specified crime by denying a license to an applicant under indictment, it may easily accomplish this purpose by amending to defer decision *for a limited period of time* [39] on an application to see if an adjudication of guilt has been made during this period—requiring denial and subsequent reapplication is both inefficient, *see* Posner, *Economic Analysis of the Law, passim* (1972) (duplicative expending of administrative and legal resources), and constitutionally infirm.[40]

Plaintiffs also attack various procedural aspects of the licensure system, including the appeal process, under *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Primary to their contention is their claim that *"no* judicial review is provided for." This assertion, however, is entirely meritless. Although no provision for judicial review is made, "none is needed. One denied a permit may seek a hearing, appeal that hearing, and then turn to courts of law." *Memet,* 642 S.W.2d at 524; *see also Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977); *Har-*

*per v. Lindsay,* 616 F.2d 849, 858 (5th Cir.1980). The appeal, revocation, and suspension provisions are replete with procedural protections and reviewable standards, and comport with *Freedman* and fundamental tenets of due process.

**Definitions.** Vagueness challenges are imposed against the various definitions and terms utilized in the Ordinance. All terms used, however, are designed to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute," *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971), in light of common understanding and practices.[41] *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1971). Indeed, the language of many provisions has been taken from ordinances upheld by the Supreme Court, *see Young,* 427 U.S. at 53, 96 S.Ct. at 2244 ("specified sexual activities" and "specified anatomical areas"); *City of Renton,* 106 S.Ct. at 927 ("primary purpose"). Other elements of the Ordinance have been upheld by the courts. *See Hart Bookstores v. Edmisten,* 612 F.2d 821, 833 (4th Cir.1979), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980) ("distinguished or characterized by"; *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ("depicting or describing"); *Hart*

---

**38.** *See Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). A legitimate theatre that occasionally exhibits explicit, nonobscene films but is not a "sexually oriented business," such as various repertory theatres in Dallas, would be forced to curtail such exhibitions in fear that a film that is subject to mere indictment as obscenity would jeopardize a pending license application—regardless of an ultimate non-obscenity finding.

**39.** The threat this subsection poses to applicants is palpable. Two plaintiffs here would be foreclosed by its terms—Beverly D. Van Dusen, owner of two bookstores, has been charged with obscenity violations, and the matter is set for trial, *see* Van Dusen Affidavit at 2; Bruce Wayne Logan, owner of Eros Dallas, has been awaiting trial for *two years* on a promotion of prostitution charge, *see* Logan Affidavit at 2.

**40.** Section 41A–5(b), which states that appeal of a conviction shall have no effect on a disqualification, is not subject to a parallel infirmity;

such provisions are routinely upheld, as they deny an applicant against whom a finding of guilt has been made. *See* State Bar Act, section 16(a), 1A *Tex.Rev.Civ.Stat.* art. 320a–1 (when attorney is convicted of felony involving moral turpitude or of misdemeanor involving theft, embezzlement, or fraudulent appropriation, the district court "shall enter an order suspending the attorney from the practice of law during the pendency of any appeals from the conviction"); *see also Bailey v. State,* 575 S.W.2d 418 (Tex.Civ. App.—Ft. Worth 1978, writ ref'd n.r.e.); *cf. McInnis v. State,* 618 S.W.2d 389 (Tex.Civ.App.— Beaumont 1981, writ ref'd n.r.e.), *cert. denied,* 456 U.S. 976, 102 S.Ct. 2242, 72 L.Ed.2d 851 (1982).

**41.** This holding does not embrace the definition given to sexual encounter centers, as no such business is present. *See* ante at 1067 n. 15.

*Bookstores,* 612 F.2d at 834 ("adult bookstore"); *Stansberry v. Holmes,* 613 F.2d 1285, 1290 (5th Cir.1980) ("major business," similar to "principal business purpose" used in Ordinance); [42] *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1210 (5th Cir. 1982) ("regularly" features); *Northend Cinema, Inc. v. Seattle,* 90 Wash.2d 709, 585 P.2d 1153 (1978), *cert. denied sub nom. Apple Theatre v. Seattle,* 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979) ("adult theatre"); *15192 Thirteen Mile Road, Inc. v. City of Warren,* 626 F.Supp. 803, 808 (E.D.Mich.1985) ("escort agency"); *SDJ, Inc. v. City of Houston,* 636 F.Supp. at 1364 (topless bars).[43] There is no constitutional impediment to the phraseology of the Ordinance.

**Internal restrictions.** The Ordinance requires various internal restrictions of regulated businesses—from major renovations in the design of adult arcades to the allowance of sofas in nude modeling studios. While such intrusions into the internal design of regulated businesses may seem unduly restrictive, they have consistently been upheld.[44] *See Wall Distributors, Inc. v. City of Newport News,* 782 F.2d 1165, 1169 (4th Cir.1986) (requiring closed viewing booths to be within view of management "falls within the broad general limits of the police power" and satisfies *O'Brien* ); *Ellwest Stereo Theatres v. Wenner,* 681 F.2d 1243, 1246 (9th Cir.1982) (same); *EWAP, Inc. v. City of Los Angeles,* 97 Cal.App.3d 179, 158 Cal.Rptr. 579 (1979) (same); *Purple Onion, Inc. v. Jackson,* 511 F.Supp. 1207, 1227 (N.D.Ga.1981) (nude modeling studios may be pervasively regulated, as they contain no element of "expression"); *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389 (8th Cir.1985) (display to minors); *Pollard v. Cockrell,* 578 F.2d 1002, 1013 (5th Cir.1978) (permissible to distinguish between "legitimate" and regulated use of nude models). The City did indeed make sufficient findings to justify restrictions on adult motels, *see* ante at 4 n. 9 (statement of Ms. Ragsdale), *cf. Patel & Patel v. South San Francisco,* 606 F.Supp. 666, 671 (N.D.Cal.1985) (no findings); moreover, recent pronouncements of state power to regulate morality and private consensual sexual activity are probably broad enough to encompass regulations on adult motels. *See Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (no privacy right to con-

---

**42.** Requiring a vendor of books dealing in "specified sexual activities" to have the sale of such material as "one of its principal business purposes" is the sole bar to a finding that, for instance, the Government Printing Office Bookstore is a "sexually oriented business" due to its pandering of the Meese Commission report, *ante* at 1065–66 n. 12—a work that is explicit in its description of activities 41A–2(19)(A), (B), (C), and (D). *See, e.g.,* the 155 pages of graphic descriptions of pornographic paperback books, peep shows, tabloids, films, and videos—including complete and *very* explicit summaries of *Deep Throat, The Devil in Miss Jones,* and *Debbie Does Dallas* —bravely written, after his prolonged study of and exposure to this relentless and unmitigated sleaze, by the redoubtable Senior Investigator Haggerty. *Id.* at 1647–1802. Although the Meese Commission concluded that sustained "viewing [of such] nonviolent, sexually explicit material … is statistically related to a higher probability of" sexual crimes, *id.* at 172, we are merely left to wonder about the fate of Senior Investigator Haggerty and his tragic battle against these statistical probabilities.

**43.** Plaintiffs make the general objection that the Ordinance cannot be directed to adult cabarets at all, claiming that a "paucity" of evidence concerning such establishments was considered by the City. This is incorrect, as both major studies considered—those from Austin and Indianapolis—concerned topless bars. Moreover, any consideration of the Ordinance and the discussion surrounding it, as a whole, reveals that the City did indeed consider topless bars part of the condition the Ordinance seeks to ameliorate; the City may permissibly include adult cabarets in the Ordinance.

**44.** A major internal restriction that plaintiffs saw as an egregious intrusion upon the working of their businesses—the interpretation of the Ordinance that only one "type" of sexually oriented business may be located in one building—is, in fact, nonexistent. The City admitted at oral argument that the Ordinance does not operate to restrict several media being dealt with by one sexually oriented business; thus, those plaintiffs that have, for example, an adult arcade plus a book and video store may continue to operate in that manner (albeit in a new location if they must relocate under the location restrictions).

sensual homosexual, and, arguably, heterosexual sodomy); *Baker v. Wade*, 769 F.2d 289 (5th Cir.1985) (*en banc*), cert. denied, — U.S. ——, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986).[45] As the City has made the requisite findings, the various restrictions on the operation, layout, design, and furnishing of regulated businesses must be upheld. *See Young*, 427 U.S. at 56 nn. 11–12, 96 S.Ct. at 2445 nn. 11–12.

**Summary.** Only the four subsections described above—41A–5(a)(8), 41A–5(c), the "under indictment or information" language of 41A–5(a)(10), and the five unrelated crimes of 41A–5(a)(10)—fail to satisfy the fourth prong of the *O'Brien* test. The ordinance is thus constitutional, with the above minor exceptions—which are severable, *see* section 41A–23(5), and may be cured by amendment.

## V. Conclusion

Efforts to restrict the accessability of sexually oriented speech have long been part of Western legal tradition,[46] as has the

---

**45.** *Bowers* determined that the state could prohibit certain sexual practices because "prohibitions against [such] conduct have ancient roots," *Bowers*, 106 S.Ct. at 2844, in "Judeao-Christian moral and ethical standards," *id.* 106 S.Ct. at 2846 (Burger, C.J., concurring). Based on the arguments before it, this Court need not inquire into whether other "prohibitions" that have "ancient roots" also require granting broad powers to states wishing to return to such time-honored values—such as, for example, the value that women may be treated as chattels.

Such a view certainly has "ancient roots." Indeed, the venerable Blackstone noted that at Roman law, a creditor might sell a debtor's wife into slavery to redeem his debts—and that in East India, a creditor is entitled to "violate with impunity the chastity of the debtor's wife." 2 *Blackstone's Commentaries* 472–73 (1778). The "Judeao-Christian" roots of such a view are, likewise, well-established. *See The Bible* (1 Timothy 2:12) ("I suffer not a woman to teach, nor to usurp authority over the man, but to be in silence"); *The Koran*, ch. 4 ("men have authority over women because Allah has made the one superior to the other … for those from whom you fear disobedience, admonish them and send them to beds apart and beat them"); J. Knox, *The First Blast of the Trumpet Against the Monstrous Regiment of Women* (1558) ("to promote a woman to bear rule … is repugnant to nature, contumely to God"). This view was shared by those respected in law; Aristotle found that "woman may be said to be an inferior man," and Lord Chesterfield described women as "children of a larger growth."

The law was persistent in defining the domain in which woman could permissibly be present. Myra Bradwell discovered this fact at the hands of the Supreme Court, when it held that Illinois could permissibly prohibit her from practicing law. *See Bradwell v. State*, 83 U.S. (16 Wall.) 130, 141, 21 L.Ed. 442 (1873) (Bradley, J., concurring) ("the paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator"); *see also Muller v. Oregon*, 208 U.S. 412, 421, 28 S.Ct. 324, 326, 52 L.Ed. 551 (1908) (a "woman's physical structure [places] her at a disadvantage in the struggle for subsist-

ence"). The law told her not only where she could not be, then, but where she *should* be. *See Tuter v. Tuter*, 120 S.W.2d 203, 205 (Mo.Ct. App.1938) ("there is but a twilight zone between a mother's love and the atmosphere of heaven, and … no child should be deprived of that maternal influence"); *Jenkins v. Jenkins*, 173 Wis. 592, 181 N.W. 826, 827 (1921) ("nothing can be an adequate substitute for motherly love"). The attitudes have been persistent. *See Hall v. Small Business Admin.*, 695 F.2d 175, 178 (5th Cir.1983) ("I don't think any female law clerk is going to give me a lot of input on how to decide a case"); *see also* Martin, *Fathers and Families: Expanding the Familial Rights of Men*, 36 *Syracuse L.Rev.* 1265, 1267 (1986). However, the "outer limits" of *Hardwick*—like those of the right of privacy itself, see *Baker v. Wade*, 553 F.Supp. 1121, 1135 (N.D.Tex.1982)—have not yet been established, so it is too early to tell if centuries-long, western culture objections to rights now held (or sought) by females and others will receive the same analysis and treatment as the right of privacy claims by the homosexual plaintiff in *Hardwick*. *See Hardwick*, 106 S.Ct. at 2853–2854 nn. 4, 5 (Blackmun, J., dissenting) (heterosexual sexual conduct, racial prejudice).

**46.** The first reported obscenity case at common law, *Le Roy v. Sir Charles Sidney*, 1 Sid. 168, pl. 29 (K.B.1663), involved Sir Charles, a nude and profane nobleman on a London balcony who spewed an "offensive liquor" upon a crowd— "the proximate source of the 'offensive liquor' appears to have been Sir Charles." *Memoirs*, 383 U.S. at 428 n. 4, 86 S.Ct. at 982 n. 4. Another early case resulted in a finding that the tract "Venus in the Cloister or the Nun in Her Smock" placed the general morality in jeopardy. *See Dominus Rex v. Curl*, 2 Strange 288, 93 Eng.Rep. 849 (K.B.1727). Early transplants of the doctrine to this country involved those intending to "deprave and corrupt those whose minds are open to such immoral influence and into whose hands a publication of this sort may fall." *R.V. Hicklin*, L.R., 3 Q.B. 360 (1868); *see also Ex Parte Jackson*, 6 Otto (96 U.S.) 727, 24 L.Ed. 877 (1878).

principle that expression should be free and unfettered.[47] The reconciliation of the competing values implicit in these two long-standing concepts inevitably shifts over time, in response to technological change [48] and evolving conceptions of the legality of legislating majoritarian conceptions of morality.[49] Restrictions in the place and manner of sexually oriented expression through zoning regulation is the most recent jurisprudential attempt to allow majority community structure to coexist with minority expression; the sexually oriented business ordinance enacted by the City follows the substantive dictates of this body of law, and must be upheld.

## APPENDIX A

## CHAPTER 41A. SEXUALLY ORIENTED BUSINESSES

SEC. 41A–1. Purpose and intent.
SEC. 41A–2. Definitions.
SEC. 41A–3. Classification.
SEC. 41A–4. License required.
SEC. 41A–5. Issuance of license.
SEC. 41A–6. Fees.
SEC. 41A–7. Inspection.
SEC. 41A–8. Expiration of license.
SEC. 41A–9. Suspension.
SEC. 41A–10. Revocation.
SEC. 41A–11. Appeal.
SEC. 41A–12. Transfer of license.
SEC. 41A–13. Location of sexually oriented businesses.
SEC. 41A–14. Exemption from location restrictions.
SEC. 41A–15. Additional regulations for escort agencies.
SEC. 41A–16. Additional regulations for nude model studios.
SEC. 41A–17. Additional regulations for adult theaters and adult motion picture theaters.
SEC. 41A–18. Additional regulations for adult motels.
SEC. 41A–19. Regulations pertaining to exhibition of sexually explicit films or videos.
SEC. 41A–20. Display of sexually explicit material to minors.
SEC. 41A–21. Enforcement.
SEC. 41A–22. Injunction.
SEC. 41A–23. Amendment of this chapter.

## CHAPTER 41A. SEXUALLY ORIENTED BUSINESSES

### SEC. 41A–1. PURPOSE AND INTENT.

(a) It is the purpose of this chapter to regulate sexually oriented businesses to promote the health, safety, morals, and general welfare of the citizens of the city, and to establish reasonable and uniform regulations to prevent the continued concentration of sexually oriented businesses within the city. The provisions of this chapter have neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials, including sexually oriented materials. Similarly, it is not the intent nor effect of this chapter to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market.

(b) It is the intent of the city council that the locational regulations of Section 41A–13 of this chapter are promulgated pursuant to Article 2372w, Revised Civil Statutes of Texas, as they apply to nude model studios and sexual encounter centers only. It is the intent of the city council that all other provisions of this chapter are promulgated pursuant to the Dallas City Charter and Article 1175, Revised Civil Statutes of Texas. (Ord. 19196)

---

**47.** *See, e.g.,* Milton, *Areopagitica: A Speech for the Liberty of Unlicensed Printing* 24 (1644); Locke, *A Letter Concerning Toleration* (1689); Bentham, *Fragment on Government* (1776); Mill, *On Liberty* (1859).

**48.** *See Community Television of Utah, Inc. v. Roy,* 555 F.Supp. 1164 (1982); Trauth & Huffman, *Obscenity and Cable Television: A Regulatory Approach* (1986).

**49.** *See, unfortunately, Baker v. Wade,* 769 F.2d 289 (5th Cir.1985) (*en banc*), *cert. denied,* —— U.S. ——, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986) (morality justifies prohibiting consensual sodomy); *Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (same). *Accord, Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 37 (1973) (morality justifies limiting expression); Devlin, *The Enforcement of Morals* (1979) (moral concensus requisite to societal survival).

SEC. 41A–2. DEFINITIONS.

In this chapter:

(1) ADULT ARCADE means any place to which the public is permitted or invited wherein coin-operated or slug-operated or electronically, electrically, or mechanically controlled still or motion picture machines, projectors, or other image-producing devices are maintained to show images to five or fewer persons per machine at any one time, and where the images so displayed are distinguished or characterized by the depicting or describing of "specified sexual activities" or "specified anatomical areas."

(2) ADULT BOOKSTORE or ADULT VIDEO STORE means a commercial establishment which as one of its principal business purposes offers for sale or rental for any form of consideration any one or more of the following:

(A) books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes or video reproductions, slides, or other visual representations which depict or describe "specified sexual activities" or "specified anatomical areas"; or

(B) instruments, devices, or paraphernalia which are designed for use in connection with "specified sexual activities."

(3) ADULT CABARET means a nightclub, bar, restaurant, or similar commercial establishment which regularly features:

(A) persons who appear in a state of nudity; or

(B) live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities"; or

(C) films, motion pictures, video cassettes, slides, or other photographic reproductions which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas."

(4) ADULT MOTEL means a hotel, motel or similar commercial establishment which:

(A) offers accommodations to the public for any form of consideration; provides patrons with closed-circuit television trans-missions, films, motion pictures, video cassettes, slides, or other photographic reproductions which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas"; and has a sign visible from the public right of way which advertises the availability of this adult type of photographic reproductions; or

(B) offers a sleeping room for rent for a period of time that is less than 10 hours; or

(C) allows a tenant or occupant of a sleeping room to subrent the room for a period of time that is less than 10 hours.

(5) ADULT MOTION PICTURE THEATER means a commercial establishment where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are regularly shown which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas."

(6) ADULT THEATER means a theater, concert hall, auditorium, or similar commercial establishment which regularly features persons who appear in a state of nudity or live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities."

(7) CHIEF OF POLICE means the chief of police of the city of Dallas or his designated agent.

(8) ESCORT means a person who, for consideration, agrees or offers to act as a companion, guide, or date for another person, or who agrees or offers to privately model lingerie or to privately perform a striptease for another person.

(9) ESCORT AGENCY means a person or business association who furnishes, offers to furnish, or advertises to furnish escorts as one of its primary business purposes, for a fee, tip, or other consideration.

(10) ESTABLISHMENT means and includes any of the following:

(A) the opening or commencement of any sexually oriented business as a new business;

(B) the conversion of an existing business, whether or not a sexually oriented business, to any sexually oriented business;

(C) the addition of any sexually oriented business to any other existing sexually oriented business; or

(D) the relocation of any sexually oriented business.

(11) LICENSEE means a person in whose name a license to operate a sexually oriented business has been issued, as well as the individual listed as an applicant on the application for a license.

(12) NUDE MODEL STUDIO means any place where a person who appears in a state of nudity or displays "specified anatomical areas" is provided to be observed, sketched, drawn, painted, sculptured, photographed, or similarly depicted by other persons who pay money or any form of consideration.

(13) NUDITY or a STATE OF NUDITY means the appearance of a human bare buttock, anus, male genitals, female genitals, or female breast.

(14) PERSON means an individual, proprietorship, partnership, corporation, association, or other legal entity.

(15) SEMI–NUDE means a state of dress in which clothing covers no more than the genitals, pubic region, and areolae of the female breast, as well as portions of the body covered by supporting straps or devices.

(16) SEXUAL ENCOUNTER CENTER means a business or commercial enterprise that, as one of its primary business purposes, offers for any form of consideration:

(A) physical contact in the form of wrestling or tumbling between persons of the opposite sex; or

(B) activities between male and female persons and/or persons of the same sex when one or more of the persons is in a state of nudity or semi-nude.

(17) SEXUALLY ORIENTED BUSINESS means an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center.

(18) SPECIFIED ANATOMICAL AREAS means human genitals in a state of sexual arousal.

(19) SPECIFIED SEXUAL ACTIVITIES means and includes any of the following:

(A) the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts;

(B) sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy;

(C) masturbation, actual or simulated; or

(D) excretory functions as part of or in connection with any of the activities set forth in (A) through (C) above.

(20) SUBSTANTIAL ENLARGEMENT of a sexually oriented business means the increase in floor area occupied by the business by more than 25 percent, as the floor area exists on June 18, 1986.

(21) TRANSFER OF OWNERSHIP OR CONTROL of a sexually oriented business means and includes any of the following:

(A) the sale, lease, or sublease of the business;

(B) the transfer of securities which constitute a controlling interest in the business, whether by sale, exchange, or similar means; or

(C) the establishment of a trust, gift, or other similar legal device which transfers the ownership or control of the business, except for transfer by bequest or other operation of law upon the death of the person possessing the ownership or control. (Ord. 19196)

SEC. 41A–3. CLASSIFICATION.

Sexually oriented businesses are classified as follows:

(1) adult arcades;

(2) adult bookstores or adult video stores;

(3) adult cabarets;

(4) adult motels;

(5) adult motion picture theaters;

(6) adult theaters;

(7) escort agencies;

(8) nude model studios; and

(9) sexual encounter centers. (Ord. 19196)

## SEC. 41A–4. LICENSE REQUIRED.

(a) A person commits an offense if he operates a sexually oriented business without a valid license, issued by the city for the particular type of business.

(b) An application for a license must be made on a form provided by the chief of police. The application must be accompanied by a sketch or diagram showing the configuration of the premises, including a statement of total floor space occupied by the business. The sketch or diagram need not be professionally prepared but must be drawn to a designated scale or drawn with marked dimensions of the interior of the premises to an accuracy of plus or minus six inches. Applicants who must comply with Section 41A–19 of this chapter shall submit a diagram meeting the requirements of Section 41A–19.

(c) The applicant must be qualified according to the provisions of this chapter and the premises must be inspected and found to be in compliance with the law by the health department, fire department, and building official.

(d) If a person who wishes to operate a sexually oriented business is an individual, he must sign the application for a license as applicant. If a person who wishes to operate a sexually oriented business is other than an individual, each individual who has a 20 percent or greater interest in the business must sign the application for a license as applicant. Each applicant must be qualified under Section 41A–5 and each applicant shall be considered a licensee if a license is granted.

(e) The fact that a person possesses a valid theater license, dance hall license, or public house of amusement license does not

exempt him from the requirement of obtaining a sexually oriented business license. A person who operates a sexually oriented business and possesses a theater license, public house of amusement license or dance hall license shall comply with the requirements and provisions of this chapter as well as the requirements and provisions of Chapter 46 and Chapter 14 of this code when applicable. (Ord. 19196)

## SEC. 41A–5. ISSUANCE OF LICENSE.

(a) The chief of police shall approve the issuance of a license by the assessor and collector of taxes to an applicant within 30 days after receipt of an application unless he finds one or more of the following to be true:

(1) An applicant is under 18 years of age.

(2) An applicant or an applicant's spouse is overdue in his payment to the city of taxes, fees, fines, or penalties assessed against him or imposed upon him in relation to a sexually oriented business.

(3) An applicant has failed to provide information reasonably necessary for issuance of the license or has falsely answered a question or request for information on the application form.

(4) An applicant or an applicant's spouse has been convicted of a violation of a provision of this chapter, other than the offense of operating a sexually oriented business without a license, within two years immediately preceding the application. The fact that a conviction is being appealed shall have no effect.

(5) An applicant is residing with a person who has been denied a license by the city to operate a sexually oriented business within the preceding 12 months, or residing with a person whose license to operate a sexually oriented business has been revoked within the preceding 12 months.

(6) The premises to be used for the sexually oriented business have not been approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances.

(7) The license fee required by this chapter has not been paid.

(8) An applicant has been employed in a sexually oriented business in a managerial capacity within the preceding 12 months and has demonstrated that he is unable to operate or manage a sexually oriented business premises in a peaceful and law-abiding manner.

(9) An applicant or the proposed establishment is in violation of or is not in compliance with Section 41A-7, 41A-12, 41A-13, 41A-15, 41A-16, 41A-17, 41A-18, 41A-19 or 41A-20.

(10) An applicant or an applicant's spouse has been convicted of or is under indictment or misdemeanor information for a crime:

(A) involving:

(i) any of the following offenses as described in Chapter 43 of the Texas Penal Code:

(aa) prostitution;

(bb) promotion of prostitution;

(cc) aggravated promotion of prostitution;

(dd) compelling prostitution;

(ee) obscenity;

(ff) sale, distribution, or display of harmful material to minor;

(gg) sexual performance by a child;

(hh) possession of child pornography;

(ii) any of the following offenses as described in Chapter 21 of the Texas Penal Code:

(aa) public lewdness;

(bb) indecent exposure;

(cc) indecency with a child;

(iii) engaging in organized criminal activity as described in Chapter 71 of the Texas Penal Code;

(iv) sexual assault or aggravated sexual assault as described in Chapter 22 of the Texas Penal Code;

(v) incest, solicitation of a child, or harboring a runaway child as described in Chapter 25 of the Texas Penal Code;

(vi) kidnapping or aggravated kidnapping as described in Chapter 20 of the Texas Penal Code;

(vii) robbery or aggravated robbery as described in Chapter 29 of the Texas Penal Code;

(viii) bribery or retaliation as described in Chapter 36 of the Texas Penal Code;

(ix) a violation of the Texas Controlled Substances Act or Dangerous Drugs Act punishable as a felony, Class A misdemeanor, or Class B misdemeanor; or

(x) criminal attempt, conspiracy, or solicitation to commit any of the foregoing offenses;

(B) for which:

(i) less than two years have elapsed since the date of conviction or the date of release from confinement imposed for the conviction, whichever is the later date, if the conviction is of a misdemeanor offense;

(ii) less than five years have elapsed since the date of conviction or the date of release from confinement for the conviction, whichever is the later date, if the conviction is of a felony offense; or

(iii) less than five years have elapsed since the date of the last conviction or the date of release from confinement for the last conviction, whichever is the later date, if the convictions are of two or more misdemeanor offenses or combination of misdemeanor offenses occurring within any 24-month period.

(b) The fact that a conviction is being appealed shall have no effect on the disqualification of the applicant or applicant's spouse.

(c) An applicant who has been convicted or whose spouse has been convicted of an offense listed in Subsection (a)(10), for which the required time period has elapsed since the date of conviction or the date of release from confinement imposed for the conviction, may qualify for a sexually oriented business license only if the chief of police determines that the applicant or applicant's spouse is presently fit to operate a sexually oriented business. In determining

present fitness under this section, the chief of police shall consider the following factors concerning the applicant or applicant's spouse, whichever had the criminal conviction:

(1) the extent and nature of his past criminal activity;

(2) his age at the time of the commission of the crime;

(3) the amount of time that has elapsed since his last criminal activity;

(4) his conduct and work activity prior to and following the criminal activity;

(5) evidence of his rehabilitation or rehabilitative effort while incarcerated or following release; and

(6) other evidence of his present fitness, including letters of recommendation from prosecution, law enforcement, and correctional officers who prosecuted, arrested, or had custodial responsibility for him; the sheriff and chief of police in the community where he resides; and any other persons in contact with him.

(d) It is the responsibility of the applicant, to the extent possible, to secure and provide to the chief of police the evidence required to determine present fitness under Subsection (c) of this section.

(e) The license, if granted, shall state on its face the name of the person or persons to whom it is granted, the expiration date, and the address of the sexually oriented business. The license shall be posted in a conspicuous place at or near the entrance to the sexually oriented business so that it may be easily read at any time. (Ord. 19196)

SEC. 41A-6. FEES.

(a) The annual fee for a sexually oriented business license is $500.

(b) If an applicant is required by this code to also obtain a dance hall license or public house of amusement license for the business at a single location, payment of the fee for the sexually oriented business license exempts the applicant from payment of the fees for the dance hall or public house of amusement licenses. (Ord. 19196)

SEC. 41A-7. INSPECTION.

(a) An applicant or licensee shall permit representatives of the police department, health department, fire department, housing and neighborhood services department, and building inspection division to inspect the premises of a sexually oriented business for the purpose of insuring compliance with the law, at any time it is occupied or open for business.

(b) A person who operates a sexually oriented business or his agent or employee commits an offense if he refuses to permit a lawful inspection of the premises by a representative of the police department at any time it is occupied or open for business. (Ord. 19196)

SEC. 41A-8. EXPIRATION OF LICENSE.

(a) Each license shall expire one year from the date of issuance and may be renewed only by making application as provided in Section 41A-4. Application for renewal should be made at least 30 days before the expiration date, and when made less than 30 days before the expiration date, the expiration of the license will not be affected.

(b) When the chief of police denies renewal of a license, the applicant shall not be issued a license for one year from the date of denial. If, subsequent to denial, the chief of police finds that the basis for denial of the renewal license has been corrected or abated, the applicant may be granted a license if at least 90 days have elapsed since the date denial became final. (Ord. 19196)

SEC. 41A-9. SUSPENSION.

The chief of police shall suspend a license for a period not to exceed 30 days if he determines that a licensee or an employee of a licensee has:

(1) violated or is not in compliance with Section 41A-7, 41A-12, 41A-13, 41A-15, 41A-16, 41A-17, 41A-18, 41A-19, or 41A-20 of this chapter;

(2) engaged in excessive use of alcoholic beverages while on the sexually oriented business premises;

(3) refused to allow an inspection of the sexually oriented business premises as authorized by this chapter;

(4) knowingly permitted gambling by any person on the sexually oriented business premises;

(5) demonstrated inability to operate or manage a sexually oriented business in a peaceful and law-abiding manner thus necessitating action by law enforcement officers. (Ord. 19196)

SEC. 41A–10. REVOCATION.

(a) The chief of police shall revoke a license if a cause of suspension in Section 41A–9 occurs and the license has been suspended within the preceding 12 months.

(b) The chief of police shall revoke a license if he determines that:

(1) a licensee gave false or misleading information in the material submitted to the chief of police during the application process;

(2) a licensee or an employee has knowingly allowed possession, use, or sale of controlled substances on the premises;

(3) a licensee or an employee has knowingly allowed prostitution on the premises;

(4) a licensee or an employee knowingly operated the sexually oriented business during a period of time when the licensee's license was suspended;

(5) a licensee has been convicted of an offense listed in Section 41A–5(a)(10)(A) for which the time period required in Section 41A–5(a)(10)(B) has not elapsed;

(6) on two or more occasions within a 12–month period, a person or persons committed an offense occurring in or on the licensed premises of a crime listed in Section 41A–5(a)(10)(A), for which a conviction has been obtained, and the person or persons were employees of the sexually oriented business at the time the offenses were committed;

(7) a licensee or an employee has knowingly allowed any act of sexual intercourse, sodomy, oral copulation, masturbation, or sexual contact to occur in or on the licensed premises. The term "sexual contact" shall have the same meaning as it is defined in Section 21.01, Texas Penal Code; or

(8) a licensee is delinquent in payment to the city for hotel occupancy taxes, ad valorem taxes, or sales taxes related to the sexually oriented business.

(c) The fact that a conviction is being appealed shall have no effect on the revocation of the license.

(d) Subsection (b)(7) does not apply to adult motels as a ground for revoking the license.

(e) When the chief of police revokes a license, the revocation shall continue for one year and the licensee shall not be issued a sexually oriented business license for one year from the date revocation became effective. If, subsequent to revocation, the chief of police finds that the basis for the revocation has been corrected or abated, the applicant may be granted a license if at least 90 days have elapsed since the date the revocation became effective. If the license was revoked under Subsection (b)(5), an applicant may not be granted another license until the appropriate number of years required under Section 41A–5(a)(10)(B) has elapsed since the termination of any sentence, parole, or probation. (Ord. 19196)

SEC. 41A–11. APPEAL.

If the chief of police denies the issuance of a license, or suspends or revokes a license, he shall send to the applicant, or licensee, by certified mail, return receipt requested, written notice of his action and the right to an appeal. The aggrieved party may appeal the decision of the chief of police to a permit and license appeal board in accordance with Section 2–96 of this code. The filing of an appeal stays the action of the chief of police in suspending or revoking a license until the permit and license appeal board makes a final decision. If within a 10 day period the chief of police suspends, revokes, or denies issuance of a dance hall license or public house of amuse-

ment license for the same location involved in the chief's actions on the sexually oriented business license, then the chief may consolidate the requests for appeals of those actions into one appeal. (Ord. 19196)

SEC. 41A–12. TRANSFER OF LICENSE.

A licensee shall not transfer his license to another, nor shall a licensee operate a sexually oriented business under the authority of a license at any place other than the address designated in the application. (Ord. 19196)

SEC. 41A–13. LOCATION OF SEXUALLY ORIENTED BUSINESSES.

(a) A person commits an offense if he operates or causes to be operated a sexually oriented business within 1,000 feet of:

(1) a church;

(2) a public or private elementary or secondary school;

(3) a boundary of a residential district as defined by the Dallas Development Code;

(4) a public park adjacent to a residential district as defined by the Dallas Development Code; or

(5) the property line of a lot devoted to residential use.

(b) A person commits an offense if he causes or permits the operation, establishment, substantial enlargement, or transfer of ownership or control of a sexually oriented business within 1,000 feet of another sexually oriented business.

(c) A person commits an offense if he causes or permits the operation, establishment, or maintenance of more than one sexually oriented business in the same building, structure, or portion thereof, or the increase of floor area of any sexually oriented business in any building, structure, or portion thereof containing another sexually oriented business.

(d) For the purposes of Subsection (a), measurement shall be made in a straight line, without regard to intervening structures or objects, from the nearest portion of the building or structure used as a part of the premises where a sexually oriented business is conducted, to the nearest property line of the premises of a church or public or private elementary or secondary school, or to the nearest boundary of an affected public park, residential district, or residential lot.

(e) For purposes of Subsection (b) of this section, the distance between any two sexually oriented businesses shall be measured in a straight line, without regard to intervening structures or objects, from the closest exterior wall of the structure in which each business is located.

(f) Any sexually oriented business lawfully operating on June 18, 1986, that is in violation of Subsections (a), (b), or (c) of this section shall be deemed a nonconforming use. The nonconforming use will be permitted to continue for a period not to exceed three years, unless sooner terminated for any reason or voluntarily discontinued for a period of 30 days or more. Such nonconforming uses shall not be increased, enlarged, extended or altered except that the use may be changed to a conforming use. If two or more sexually oriented businesses are within 1,000 feet of one another and otherwise in a permissible location, the sexually oriented business which was first established and continually operating at a particular location is the conforming use and the later-established business(es) is nonconforming.

(g) A sexually oriented business lawfully operating as a conforming use is not rendered a nonconforming use by the location, subsequent to the grant or renewal of the sexually oriented business license, of a church, public or private elementary or secondary school, public park, residential district, or residential lot within 1,000 feet of the sexually oriented business. This provision applies only to the renewal of a valid license, and does not apply when an application for a license is submitted after a license has expired or has been revoked. (Ord. 19196)

SEC. 41A–14. EXEMPTION FROM LOCATION RESTRICTIONS.

(a) If the chief of police denies the issuance of a license to an applicant because

 the location of the sexually oriented business establishment is in violation of Section 41A–13 of this chapter, then the applicant may, not later than 10 calendar days after receiving notice of the denial, file with the city secretary a written request for an exemption from the locational restrictions of Section 41A–13.

(b) If the written request is filed with the city secretary within the 10–day limit, a permit and license appeal board, selected in accordance with Section 2–95 of this code, shall consider the request. The city secretary shall set a date for the hearing within 60 days from the date the written request is received.

(c) A hearing by the board may proceed if at least two of the board members are present. The board shall hear and consider evidence offered by any interested person. The formal rules of evidence do not apply.

(d) The permit and license appeal board may, in its discretion, grant an exemption from the locational restrictions of Section 41A–13 if it makes the following findings:

(1) that the location of the proposed sexually oriented business will not have a detrimental effect on nearby properties or be contrary to the public safety or welfare;

(2) that the granting of the exemption will not violate the spirit and intent of this chapter of the city code;

(3) that the location of the proposed sexually oriented business will not downgrade the property values or quality of life in the adjacent areas or encourage the development of urban blight;

(4) that the location of an additional sexually oriented business in the area will not be contrary to any program of neighborhood conservation nor will it interfere with any efforts of urban renewal or restoration; and

(5) that all other applicable provisions of this chapter will be observed.

(e) The board shall grant or deny the exemption by a majority vote. Failure to reach a majority vote shall result in denial of the exemption. Disputes of fact shall be decided on the basis of a preponderance of the evidence. The decision of the permit and license appeal board is final.

(f) If the board grants the exemption, the exemption is valid for one year from the date of the board's action. Upon the expiration of an exemption, the sexually oriented business is in violation of the locational restrictions of Section 41A–13 until the applicant applies for and receives another exemption.

(g) If the board denies the exemption, the applicant may not re-apply for an exemption until at least 12 months have elapsed since the date of the board's action.

(h) The grant of an exemption does not exempt the applicant from any other provisions of this chapter other than the locational restrictions of Section 41A–13. (Ord. 19196)

SEC. 41A–15. ADDITIONAL REGULATIONS FOR ESCORT AGENCIES.

(a) An escort agency shall not employ any person under the age of 18 years.

(b) A person commits an offense if he acts as an escort or agrees to act as an escort for any person under the age of 18 years. (Ord. 19196)

SEC. 41A–16. ADDITIONAL REGULATIONS FOR NUDE MODEL STUDIOS.

(a) A nude model studio shall not employ any person under the age of 18 years.

(b) A person under the age of 18 years commits an offense if he appears in a state of nudity in or on the premises of a nude model studio. It is a defense to prosecution under this subsection if the person under 18 years was in a restroom not open to public view or persons of the opposite sex.

(c) A person commits an offense if he appears in a state of nudity or knowingly allows another to appear in a state of nudity in an area of a nude model studio premises which can be viewed from the public right of way.

(d) A nude model studio shall not place or permit a bed, sofa, or mattress in any room on the premises, except that a sofa

may be placed in a reception room open to the public. (Ord. 19196)

## SEC. 41A–17. ADDITIONAL REGULATIONS FOR ADULT THEATERS AND ADULT MOTION PICTURE THEATERS.

(a) The requirements and provisions of Chapter 46 of this code remain applicable to adult theaters and adult motion picture theaters.

(b) A person commits an offense if he knowingly allows a person under the age of 18 years to appear in a state of nudity in or on the premises of an adult theater or adult motion picture theater.

(c) A person under the age of 18 years commits an offense if he knowingly appears in a state of nudity in or on the premises of an adult theater or adult motion picture theater.

(d) It is a defense to prosecution under Subsections (b) and (c) of this section if the person under 18 years was in a restroom not open to public view or persons of the opposite sex. (Ord. 19196)

## SEC. 41A–18. ADDITIONAL REGULATIONS FOR ADULT MOTELS.

(a) Evidence that a sleeping room in a hotel, motel, or similar commercial establishment has been rented and vacated two or more times in a period of time that is less than 10 hours creates a rebuttable presumption that the establishment is an adult motel as that term is defined in this chapter.

(b) A person commits an offense if, as the person in control of a sleeping room in a hotel, motel, or similar commercial establishment that does not have a sexually oriented business license, he rents or subrents a sleeping room to a person and, within 10 hours from the time the room is rented, he rents or subrents the same sleeping room again.

(c) For purposes of Subsection (b) of this section, the terms "rent" or "subrent" mean the act of permitting a room to be occupied for any form of consideration. (Ord. 19196)

## SEC. 41A–19. REGULATIONS PERTAINING TO EXHIBITION OF SEXUALLY EXPLICIT FILMS OR VIDEOS.

(a) A person who operates or causes to be operated a sexually oriented business, other than an adult motel, which exhibits on the premises in a viewing room of less than 150 square feet of floor space, a film, video cassette, or other video reproduction which depicts specified sexual activities or specified anatomical areas, shall comply with the following requirements:

(1) Upon application for a sexually oriented business license, the application shall be accompanied by a diagram of the premises showing a plan thereof specifying the location of one or more manager's stations and the location of all overhead lighting fixtures and designating any portion of the premises in which patrons will not be permitted. A manager's station may not exceed 32 square feet of floor area. The diagram shall also designate the place at which the permit will be conspicuously posted, if granted. A professionally prepared diagram in the nature of an engineer's or architect's blueprint shall not be required; however each diagram should be oriented to the north or to some designated street or object and should be drawn to a designated scale or with marked dimensions sufficient to show the various internal dimensions of all areas of the interior of the premises to an accuracy of plus or minus six inches. The chief of police may waive the foregoing diagram for renewal applications if the applicant adopts a diagram that was previously submitted and certifies that the configuration of the premises has not been altered since it was prepared.

(2) The application shall be sworn to be true and correct by the applicant.

(3) No alteration in the configuration or location of a manager's station may be made without the prior approval of the chief of police or his designee.

(4) It is the duty of the owners and operator of the premises to ensure that at least one employee is on duty and situated in

each manager's station at all times that any patron is present inside the premises.

(5) The interior of the premises shall be configured in such a manner that there is an unobstructed view from a manager's station of every area of the premises to which any patron is permitted access for any purpose excluding restrooms. Restrooms may not contain video reproduction equipment. If the premises has two or more manager's stations designated, then the interior of the premises shall be configured in such a manner that there is an unobstructed view of each area of the premises to which any patron is permitted access for any purpose from at least one of the manager's stations. The view required in this subsection must be by direct line of sight from the manager's station.

(6) It shall be the duty of the owners and operator, and it shall also be the duty of any agents and employees present in the premises to ensure that the view area specified in Subsection (5) remains unobstructed by any doors, walls, merchandise, display racks or other materials at all times that any patron is present in the premises and to ensure that no patron is permitted access to any area of the premises which has been designated as an area in which patrons will not be permitted in the application filed pursuant to Subsection (1) of this section.

(7) The premises shall be equipped with overhead lighting fixtures of sufficient intensity to illuminate every place to which patrons are permitted access at an illumination of not less than one (1.0) footcandle as measured at the floor level.

(8) It shall be the duty of the owners and operator and it shall also be the duty of any agents and employees present in the premises to ensure that the illumination described above, is maintained at all times that any patron is present in the premises.

(b) A person having a duty under Subsections (1) through (8) of Subsection (a) above commits an offense if he knowingly fails to fulfill that duty. (Ord. 19196)

## SEC. 41A–20. DISPLAY OF SEXUALLY EXPLICIT MATERIAL TO MINORS.

(a) A person commits an offense if, in a business establishment open to persons under the age of 17 years, he displays a book, pamphlet, newspaper, magazine, film, or video cassette, the cover of which depicts, in a manner calculated to arouse sexual lust or passion for commercial gain or to exploit sexual lust or perversion for commercial gain, any of the following:

(1) human sexual intercourse, masturbation, or sodomy;

(2) fondling or other erotic touching of human genitals, pubic region, buttocks, or female breasts;

(3) less than completely and opaquely covered human genitals, buttocks, or that portion of the female breast below the top of the areola; or

(4) human male genitals in a discernibly turgid state, whether covered or uncovered.

(b) In this section "display" means to locate an item in such a manner that, without obtaining assistance from an employee of the business establishment:

(1) it is available to the general public for handling and inspection; or

(2) the cover or outside packaging on the item is visible to members of the general public. (Ord. 19196)

## SEC. 41A–21. ENFORCEMENT.

(a) Except as provided by Subsection (b), any person violating Section 41A–13 of this chapter, upon conviction, is punishable by a fine not to exceed $1,000.

(b) If the sexually oriented business involved is a nude model studio or sexual encounter center, then violation of Section 41A–4(a) or 41A–13 of this chapter is punishable as a Class B misdemeanor.

(c) Except as provided by Subsection (b), any person violating a provision of this chapter other than Section 41A–13, upon conviction, is punishable by a fine not to exceed $200.

(d) It is a defense to prosecution under Section 41A–4(a), 41A–13, or 41A–16(d) that a person appearing in a state of nudity did so in a modeling class operated:

(1) by a proprietary school licensed by the state of Texas; a college, junior college, or university supported entirely or partly by taxation;

(2) by a private college or university which maintains and operates educational programs in which credits are transferrable to a college, junior college, or university supported entirely or partly by taxation; or

(3) in a structure:

(A) which has no sign visible from the exterior of the structure and no other advertising that indicates a nude person is available for viewing; and

(B) where in order to participate in a class a student must enroll at least three days in advance of the class; and

(C) where no more than one nude model is on the premises at any one time.

(e) It is a defense to prosecution under Section 41A–4(a) or Section 41A–13 that each item of descriptive, printed, film, or video material offered for sale or rental, taken as a whole, contains serious literary, artistic, political, or scientific value. (Ord. 19196)

SEC. 41A–22. INJUNCTION.

A person who operates or causes to be operated a sexually oriented business without a valid license or in violation of Section 41A–13 of this chapter is subject to a suit for injunction as well as prosecution for criminal violations. (Ord. 19196)

SEC. 41A–23. AMENDMENT OF THIS CHAPTER.

Sections 41A–13 and 41A–14 of this chapter may be amended only after compliance with the procedure required to amend a zoning ordinance. Other sections of this chapter may be amended by vote of the city council. (Ord. 19196)

8343H